IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-03059-01-CR-S-MDH |
| | ) | |
| CHIMANGA D. SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION

Before the Court is the Motion to Suppress Evidence (doc. 22) and the Motion to Suppress Statements (doc. 51) filed by Defendant Chimanga D. Smith. Pursuant to 28 U.S.C. § 636(b) and Local Rule 72.1, this action was referred to the undersigned for the purpose of submitting a report on all pretrial motions to suppress evidence. Evidentiary hearings were conducted on January 24, 2018 and April 3, 2018. As follows, it is **RECOMMENDED** that the Motion to Suppress Evidence be **DENIED** and the Motion to Suppress Statements be **GRANTED IN PART AND DENIED IN PART**.

Defendant has been charged by a three-count Superseding Indictment (doc. 46) as follows: Count 1, possession of methamphetamine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); Count 2, possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c); and, Count 3, being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[1] In the first motion, Defendant moves to suppress "all evidence gathered relative to the April 27, 2017, arrest of [him] in Springfield, Greene County, Missouri." Specifically, he moves to suppress the Bersa

---

[1] Although the first motion was made as to the original Indictment, the parties agree that it applies equally to the Superseding Indictment.

brand, Thunder 380 model, .380-caliber firearm, alleged controlled substances, statements made by him and witnesses, and any other items resulting from the warrantless search of his vehicle, a 2004 Nissan Maxima. In the second motion, Defendant moves to suppress "all of his oral statements made during the time period between when the Defendant is first detained and placed in handcuffs, and the moment he receives his *Miranda* warnings." He further seeks the suppression of all evidence that used his pre-*Miranda* statements as the basis for probable cause to search his vehicle. At the hearings, the Court heard testimony from Sergeant Justin Gargus, Officer Jason Friend, and Officer Adam Rowles of the Springfield, Missouri Police Department.

## I. Findings of Fact[2]

Sergeant Justin Gargus ("Sgt. Gargus") is the supervisor of the Special Investigations Unit of the Springfield, Missouri Police Department ("SPD"), which focuses on drug and firearms violations committed by gangs and violent career criminals. On April 27, 2017 at approximately 10:39 p.m., Sgt. Gargus was patrolling in Springfield, Missouri, when he observed a silver Nissan Maxima driving without a front license plate, a violation of state law. He thought the front passenger, a white female, looked familiar. He followed the Maxima and noted its rear license plate number, CN2-A9K. He recalled a reported incident that occurred on April 13, 2017, two weeks earlier. The incident involved a black male assaulting a white female in a Walmart parking lot. When a witness tried to intervene, the black male pointed a handgun at the witness, then left in a silver Nissan Maxima with the same license plate number, CN2-A9K. Sgt. Gargus ran a check on the license plate and learned it was registered to a different vehicle, a 1997 Oldsmobile, also a violation of state law. Based on these two license plate violations, Sgt. Gargus turned on his lights and siren at Grant Street and the Chestnut Expressway to conduct a

---

[2] The facts set forth are taken from the testimony adduced and the exhibits admitted at the hearing on the motion. See Transcript (Doc. 50) and Exhibit Indexes (Docs. 48, 49).

traffic stop. However, the Maxima continued southbound on Grant Street, failed to yield, and accelerated to speeds in excess of 70 miles per hour in areas where the speed limit is 35 miles per hour. Per SPD policy, Sgt. Gargus did not pursue, as he lacked sufficient charges.

Sgt. Gargus then relayed the vehicle description to dispatch and over the radio. He received a response from an Officer Cooney, who stated that he had encountered the same Maxima a few days earlier, at which time it was being driven by Defendant. Upon hearing this information, Sgt. Gargus recalled that the familiar female passenger was Defendant's girlfriend. Prior to April 27, 2017, Sgt. Gargus had read police reports of two recent incidents allegedly involving Defendant. In the first incident, on February 5, 2017, two males dragged a victim out of a car and physically assaulted him. The two male suspects were both armed with handguns and shots were fired, although no one was hit by a bullet. The victim identified Defendant as one of the suspects. The second incident was a drive-by shooting that took place on February 13, 2017, with a witness identifying Defendant as the shooter. Sgt. Gargus was also aware that Defendant is a convicted felon.

Less than one hour after Sgt. Gargus first encountered the Maxima, SPD Officers Rauch and Pinegar located the Maxima at a gas station at 1605 East Kearney in Springfield, Missouri. At 11:33 p.m., the Maxima was at a gas pump when Sgt. Gargus pulled his vehicle in front of it and Officers Rauch and Pinegar pulled their vehicle behind it. The Maxima tried to reverse, but was blocked by the police vehicles and the gas pump and was unable to move. Through the front windshield, Sgt. Gargus recognized the driver as Defendant. Sgt. Gargus exited his vehicle with his gun drawn and ordered Defendant to show his hands. Defendant was moving around in his seat, reaching with both hands toward the floor and also with his left hand between his seat and the door. Concerned that Defendant was either retrieving or concealing a firearm, Sgt. Gargus

3

ordered Defendant to exit the Maxima. Although Defendant did not initially comply, he eventually raised his hands, opened the door, exited the Maxima, closed the door, and put his hands above his head, leaving the Maxima's doors locked and engine running. Defendant was placed in handcuffs by Officer Rauch at approximately 11:35:20 pm. While Officer Rauch was cuffing Defendant, SPD Officer Jason Friend ("Officer Friend") approached the Maxima to see if any other persons were inside or hiding in the back. He could not, however, see through the rear and side windows, because they were "severely dark tinted."

Sgt. Gargus approached Defendant, who asked "What's this about?" Sgt. Gargus replied "You know what this is about." Defendant asked "What's that?" and Sgt. Gargus responded "You know what's that." Defendant then said "What's up?" and Sgt. Gargus said to him, "I tried to stop you at Grant and Chestnut. Why didn't you pull over?" Defendant mumbled something unclear to Sgt. Gargus. Sgt. Gargus then asked Defendant if he could search him, to which Defendant replied "yeah."

While Sgt. Gargus was frisking Defendant, a woman exited the Maxima from the rear driver side door and shut the door, which remained locked. Until the woman exited the vehicle, the officers were unaware she was in the back of the Maxima, due to the heavily-tinted windows. Next, from outside the Maxima, Officer Friend shined a flashlight through the front windshield and observed a black and silver handgun sticking out from under the front of the driver seat. Like Sgt. Gargus, Officer Friend also knew Defendant was a convicted felon. Defendant then showed the officers that the front passenger window was covered in plastic. Officer Friend peeled back the plastic and unlocked the door. At this point, approximately 11:37:33 pm, just over two minutes after Defendant was handcuffed, Sgt. Gargus advised him of his *Miranda* rights. Upon opening the door, Officer Friend smelled a strong odor of marijuana coming from

4

inside the car. He then climbed into the Maxima to confirm no other persons were hiding on the floorboards or in the back seat.

While Officer Friend was looking in the Maxima, SPD Officer Adam Rowles ("Officer Rowles") approached and asked him to retrieve a jacket for the woman who had exited the Maxima. Officer Friend retrieved the jacket from the front passenger seat, noted the jacket smelled of marijuana, and gave it to Officer Rowles. While standing next to the Maxima, Officer Rowles noted the smell of marijuana coming from inside the vehicle. Officer Rowles also noted that the jacket smelled of marijuana, checked it for weapons or contraband, and found a burnt marijuana roach in an inside pocket. He then gave the jacket to the female passenger.

Less than one minute after opening the Maxima's door, Officer Friend turned off the engine, removed the keys, exited the vehicle, and closed the door. Upon Defendant's request, Officer Friend turned off the headlights, then placed the keys on the roof of the car. Officer Friend then told Sgt. Gargus about the handgun on the driver's floorboard.

Sgt. Gargus then proceeded to search the Maxima, locating the loaded Bersa .380 handgun "sticking out from under the driver's seat[, which] could not be completely concealed because of the power seat's electric motor under the seat wouldn't allow." On the driver's seat, he found a black zipper pouch containing two plastic bags containing a crystalline substance consistent with methamphetamine, a smaller plastic bag containing a small amount of powder consistent with heroin, a bag of plant material he recognized as marijuana, some empty bags and a digital scale. Also, he found a backpack in the back seat which contained plastic bags of a crystalline substance consistent with methamphetamine. Lastly, in the trunk, he found a large amount of loose ball ammunition. Following the search, the Maxima was released to the female passenger, and Defendant was transported to the Greene County Jail.

5

## II.     Conclusions of Law

The Fourth Amendment protects citizens from unreasonable searches and seizures by the government.  See U.S. Const. amend. VI; *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005).  Generally, evidence found as a result of an unlawful search or seizure, and the fruits therefrom, cannot be used against a defendant and must be suppressed.  *United States v. Riesselman*, 646 F.3d 1072, 1078-79 (8th Cir. 2011).  However, searches conducted pursuant to established and well-delineated exceptions do not require a warrant and are thus not unreasonable.  *Arizona v. Gant*, 556 U.S. 332, 338 (2009).  In his first motion, Defendant argues the search incident to lawful arrest exception did not apply, because he was outside the vehicle, handcuffed and secure.  He then argues the automobile exception also does not apply.  Contrary to Defendant's arguments, however, the uncontroverted evidence shows that several other exceptions to the warrant requirement justified the search of the Maxima.

### A.     *Terry* search of the Maxima

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that a limited protective search for weapons, commonly referred to as a *Terry* search, is constitutional "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous."  *Id*. at 30.  The Supreme Court later recognized "investigative detentions involving suspects in vehicles are especially fraught with dangers to police officers" and extended the principle of the *Terry* search to the passenger compartment of a vehicle, "limited to those areas in which a weapon may be placed or hidden."  *Michigan v. Long*, 463 U.S. 1032, 1047-49 (1983).

6

Case 6:17-cr-03059-MDH    Document 56    Filed 08/29/18    Page 6 of 14

To conduct a *Terry* search, the officer must have "a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer[] in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. *Long*, 463 U.S. at 1049 (quoting *Terry*, 392 U.S. at 21). Furthermore, "[i]f, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should [] discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances." *Id*. at 1050.

Here, the officers initiated an investigatory detention when they blocked the Maxima from moving at the gas pump, ordered its driver to exit, and placed him in handcuffs. Less than one hour earlier, Sgt. Gargus had attempted to stop the same vehicle for two license plate violations, but it refused to pull over and sped away at over 70 miles per hour in areas where the speed limit is 35 miles per hour. Accordingly, the officers reasonably suspected that criminal activity was afoot, justifying their detention of Defendant to investigate the fleeing a vehicle stop violation earlier that evening.

Furthermore, the officers reasonably believed that Defendant was dangerous and could gain immediate control of weapons. Less than one hour earlier, the Maxima had evaded a traffic stop by fleeing at high speeds. Sgt. Gargus knew that two weeks earlier, a black male with a handgun reportedly committed an assault, then drove away in a vehicle with the same description and license plate number as the Maxima. He also was aware that in the last three months, Defendant had allegedly been involved in two separate assault incidents where a handgun was fired. At the gas pump, Defendant initially refused to exit the vehicle as ordered, was moving around in his seat and reaching with both hands toward the floor and also with his left hand

7

between his seat and the door. These furtive actions made Sgt. Gargus think Defendant was either retrieving or concealing a firearm. See *United States v. Morgan*, 729 F.3d 1086, 1090 (8th Cir. 2013) (noting "furtive gestures" by driver gave officers a "reason to believe that there was a weapon in the vehicle"); *United States v. Martinez-Cortes*, 566 F.3d 767, 771 (8th Cir. 2009) (finding that furtive movements by driver gave officers "reason to suspect ... that the occupants might be a risk to officer safety unless detained"). Additionally, the side and rear windows of the Maxima were so darkly tinted as to make it difficult to see inside to determine whether other persons were hiding in a vehicle where a dangerous suspect was seen engaging in suspicious activity. See *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011) ("once reasonable suspicion is established, a protective search of a vehicle's interior is permissible regardless of whether the occupants have been removed from the vehicle"); See also *United States v. Newell*, 596 F.3d 876, 880 (8th Cir. 2010) ("The officers were not required to hope [the defendant] was not arming himself behind the heavily-tinted windows while they asked him to roll down the window or step out of the [car]").

Under these circumstances, it was reasonable to suspect that Defendant was dangerous and could gain access to weapons. Furthermore, once a ticket was issued for the fleeing a traffic stop violation, any passengers, and possibly Defendant, would have been allowed to return to the vehicle. See *United States v. Goodwin-Bey*, 584 F.3d 1117, 1121 (8th Cir. 2009) ("All of the occupants were outside the vehicle at the time of the search, but absent an arrest, they would have been free to reenter the vehicle and pose a danger to the officers") (internal citations and quotations omitted).

8

Case 6:17-cr-03059-MDH    Document 56    Filed 08/29/18    Page 8 of 14

Consequently, the undersigned concludes that a protective search of the Maxima for weapons and other persons was justified under the dangerousness exception set forth in *Terry v. Ohio* and *Michigan v. Long*.

### B. Plain-view of the firearm

The plain-view doctrine provides another exception to the warrant requirement. Under the plain-view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Class*, 883 F.3d 734, 737 (8th Cir. 2018) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).

Early in the encounter, while trying to determine if there were any other persons hiding in the locked vehicle, Officer Friend shined his flashlight through the front windshield and saw the handgun on the floorboard sticking out from under the front of the driver seat. It is "beyond dispute" that the action of a police officer in shining his flashlight to illuminate the interior of a car, without probable cause to search the car, "trenched upon no right secured [] by the Fourth Amendment." *Texas v. Brown*, 460 U.S. 730, 739-40 (1983); see also *United States v. Evans*, 830 F.3d 761, 766 (8th Cir. 2016) (shining a flashlight to illuminate a darkened area during a legitimate search is not constitutionally prohibited). Thus, Officer Friend was lawfully in a position outside of the Maxima from which he viewed the handgun.

Since Officer Friend knew Defendant was a convicted felon, he also knew that it was illegal for him to possess a firearm. See *United States v. Raines*, 243 F.3d 419, 422 (8th Cir. 2001) (immediately apparent means the police have "probable cause to associate the item with criminal activity"). Accordingly, the incriminating nature of the handgun on the driver's floorboard was immediately apparent to Officer Friend.

As for whether the officers had a lawful right of access to the handgun in the vehicle, "probable cause to believe that an automobile contains contraband that is subject to seizure and destruction has long been held to justify a warrantless search of the automobile and seizure of the contraband." *Evans*, 830 F.3d at 767 (citing *United States v. Ross*, 456 U.S. 798, 806-07 (1982)) Consequently, based on the clearly incriminating nature of the handgun observed by Officer Friend, the officers "had probable cause to enter the parked – but highly mobile – vehicle, without a warrant, and to seize" the handgun. *Id.* (citing *Brown*, 653 F.3d at 662).

As a result, based on Officer Friend's observation of the handgun in plain view, it is clear that the officers had probable cause to enter the Maxima and seize the handgun without a warrant.

      **C.**      **Plain-smell of marijuana**

Also applicable in this matter is the plain-smell doctrine, which is similar to the plain-view doctrine. "The Supreme Court has recognized that the odor of an illegal drug can be highly probative in establishing probable cause for a search." *United States v. Caves,* 890 F.2d 87, 90 (8th Cir.1989) (citing *Johnson v. United States,* 333 U.S. 10, 13 (1948)). The Eighth Circuit has held in numerous cases that the smell of marijuana coming from a vehicle supports probable cause to search for drugs. See *United States v. Smith*, 789 F.3d 923, 929(8th Cir. 2015) (the "slight odor of marijuana" was "sufficient to establish probable cause to search an automobile and its contents"); *United States v. Winters*, 221 F.3d 1039, 1042 (8th Cir. 2000) (the smell of raw marijuana created "probable cause to search the car and its contents for drugs"); *United States v. Peltier*, 217 F.3d 608, 610 (8th Cir. 2000) (the odor of burnt marijuana "gave the deputy probable cause to search [the] truck for drugs"); *United States v. McCoy*, 200 F.3d 582, 584 (8th Cir. 2000) (the odor of burnt marijuana on the suspect and the smell of air freshener in the car

10

gave officer probable cause to search the vehicle); *United States v. Neumann*, 183 F.3d 753, 757 (8th Cir. 1999) (officer's detection of smell of burnt marijuana provided probable cause to search entire vehicle); *Caves*, 890 F.2d at 90-91 (8th Cir. 1989) (the smell of burnt marijuana supported probable cause for a vehicle search).

Here, upon opening the Maxima's door to clear the vehicle, Officer Friend immediately smelled a "strong odor of marijuana" coming from inside the vehicle. When Officer Rowles approached Officer Friend to ask him to retrieve the female passenger's jacket, he too noticed the smell of marijuana from inside the Maxima. Officer Rowles also smelled marijuana on the jacket itself, and upon searching the jacket for weapons or drugs, found a burnt marijuana roach.

Therefore, based on their detection of the smell of marijuana coming from inside the Maxima, along with the discovery of the marijuana roach in the jacket, the officers had sufficient probable cause to search the entire vehicle and its contents for drugs, and no warrant was necessary.

### D. Defendant's pre-*Miranda* statements

In his second motion to suppress, Defendant specifically moves to suppress any statements he made prior to receiving *Miranda* warnings. He asserts that in the two minutes between being handcuffed and being advised of his *Miranda* rights, Sgt. Gargus said to him "You know what this is about… You just fled from me just now. Why didn't you pull over?" He argues that this constituted questioning "about whether he was the driver earlier when the Nissan vehicle fled from Police." Defendant further claims that his response was an admission that he was the driver of the fleeing vehicle. According to Defendant, the officers used this pre-*Miranda* admission as the basis for probable cause to search his vehicle. However, Defendant argues this admission was obtained in violation of his rights against self-incrimination, to

11

counsel, and to due process under the Missouri Constitution and United States Constitution, meaning the officers cannot use this statement as a basis to search his vehicle.

*Miranda* warnings are procedural safeguards against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The requirements of *Miranda* are triggered only when a defendant is both in custody and being interrogated. *United States v. Boyd*, 180 F.3d 967, 976 (8th Cir. 1999). Interrogation refers to direct questioning by the police, as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

In this matter, the Government does not claim that Defendant, who had just been ordered at gunpoint to exit his vehicle by multiple officers, and was now handcuffed as part of an investigatory detention, was not in "custody." See *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (A seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.") Rather, the Government argues that Sgt. Gargus did not interrogate Defendant because Defendant initiated the conversation, Defendant's allegedly incriminating statement was incomprehensible, and his statement had no bearing on the officers' probable cause determination.

Even assuming that Sgt. Gargus was interrogating Defendant when he said to him, "I tried to stop you at Grant and Chestnut. Why didn't you pull over," the undersigned finds that Defendant's purportedly incriminating statement was mumbled and unintelligible. According to Sgt. Gargus, Defendant "mumbled something. I don't recall what it was or understood what he said." Then after viewing the dash camera video, Sgt. Gargus further testified that he thought "[Defendant] might have said something about tripping, wasn't tripping, but I don't know for

12

sure if that's what he said." The dash cam video itself provides no clarification of this issue. Therefore, because Sgt. Gargus did not hear or understand what, if anything, was said, Defendant's alleged statement disclosed no facts or information and had no testimonial effect. See *United States v. Hubbell*, 530 U.S. 27, 34 n.8 (2000) (the privilege against self-incrimination "may be asserted only to resist compelled explicit or implicit disclosures of incriminating information"); see also *Doe v. United States*, 487 U.S. 201, 210 (1988) ("in order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information").

Further, even assuming that Defendant's response was an admission of guilt as to the earlier fleeing incident, the subsequent seizures of the firearm, ammunition and drugs are not meaningfully connected to Defendant's response. This is because Sgt. Gargus learned nothing from Defendant's response that enabled him to locate the firearm, ammunition or drugs. As discussed above, contrary to Defendant's arguments, the officers did not use anything said by Defendant to support probable cause to search the vehicle. Rather, as set forth above, multiple independent justifications to search the vehicle existed. First, there was ample justification to conduct a protective search of the vehicle for weapons or other persons. Then, before a protective search of the vehicle was performed, Officer Friend observed a handgun through the front windshield on the driver's floorboard, creating a separate basis, plain-view, to enter the vehicle and seize the handgun. Lastly, upon opening the vehicle door to clear the vehicle of other persons or weapons, Officer Friend and Officer Rowles both detected the smell of marijuana coming from inside the vehicle, providing probable cause to search the entire vehicle and its contents for drugs.

13

Based on the foregoing, assuming that Sgt. Gargus's statements to Defendant amounted to a custodial interrogation, any purportedly incriminating statement(s) made by Defendant after he was handcuffed, but before he was read his Miranda rights, should be suppressed. However, the second motion to suppress presents no basis to suppress any other evidence that was found in the vehicle, specifically the firearm, ammunition, and drugs. This is because the purportedly incriminating statement was mumbled and unintelligible, and was therefore not testimonial. And, the firearm, ammunition, and drugs were all discovered by the officers pursuant to lawful and independent exceptions to the warrant requirement. Accordingly, the second motion to suppress should be denied as to the physical evidence, i.e. the gun, ammunition, and drugs, seized from the vehicle.

### III. Recommendation

As set forth above, it is **RECOMMENDED** that Defendant's Motion to Suppress Evidence (doc. 22) be **DENIED**, and Defendant's Motion to Suppress Statements (doc. 51) be **GRANTED IN PART AND DENIED IN PART**.

/s/ *David P. Rush*
DAVID P. RUSH
UNITED STATES MAGISTRATE JUDGE

DATE: August 29, 2018